No. 23-11097

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF UTAH; STATE OF TEXAS; COMMONWEALTH OF
VIRGINIA; STATE OF LOUISIANA; STATE OF ALABAMA; STATE
OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE
OF GEORGIA; STATE OF INDIANA; STATE OF IDAHO; STATE OF
IOWA; STATE OF KANSAS; COMMONWEALTH OF KENTUCKY;
STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF
MONTANA; STATE OF NEBRASKA; STATE OF NEW HAMPSHIRE;
STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF SOUTH
CAROLINA; STATE OF TENNESSEE; STATE OF WEST VIRGINIA;
STATE OF WYOMING; LIBERTY ENERGY, INCORPORATED;
LIBERTY OILFIELD SERVICES, L.L.C.; WESTERN ENERGY
ALLIANCE; JAMES R. COPLAND; ALEX L. FAIRLY; STATE OF
OKLAHOMA,

Plaintiffs-Appellants,

v.

JULIE A. SU, Acting Secretary, U.S. Department of Labor; UNITED
STATES DEPARTMENT OF LABOR,

Defendants-Appellees.

On Appeal from the U.S. District Court
for the Northern District of Texas

OPENING BRIEF FOR APPELLANTS

SEAN REYES
Attorney General
MELISSA A. HOLYOAK
Solicitor General
CHRISTOPHER A. BATES
Deputy Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov
chrisbates@agutah.gov

BRUNN (BEAU) ROYSDEN
Fusion Law, PLLC
7600 N. 15th Street, Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for State of Utah*

JONATHAN BERRY
 *Counsel of Record*
R. TRENT MCCOTTER
MICHAEL BUSCHBACHER
JARED M. KELSON
ANDREW W. SMITH
CALEB ORR

Boyden Gray PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

*Counsel for Liberty Energy Inc.,*
*Liberty Oilfield Services LLC,* and
*Western Energy Alliance*

NEVILLE HEDLEY
ANNA ST. JOHN
Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006
(917) 327-2392
ned.hedley@hlli.org
anna.stjohn@hlli.org

*Counsel for James R. Copland and*
*Alex L. Fairly*

KEN PAXTON
Attorney General
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney
  General
RALPH MOLINA
Deputy Attorney General for Legal
  Strategy
MONROE DAVID BRYANT
ZACHARY BERG
Special Counsels

Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2547
(512) 936-1700
brent.webster@oag.texas.gov
grant.dorfman@oag.texas.gov
ralph.molina@oag.texas.gov
david.bryant@oag.texas.gov
zachary.berg@oag.texas.gov

*Counsel for State of Texas*

JASON MIYARES
Attorney General
ANDREW N. FERGUSON
Solicitor General
KEVIN M. GALLAGHER
Deputy Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Commonwealth of
Virginia*

LIZ MURRILL
Attorney General
JOSEPH S. ST. JOHN
MORGAN BRUNGARD
Deputy Solicitor General
TRACY SHORT
Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov
brungardm@ag.louisiana.gov

*Counsel for State of Louisiana*

STEVE MARSHALL
Attorney General
EDMUND LACOUR
Solicitor General

Alabama Attorney General's Office
501 Washington Ave
Montgomery, AL 36014
(334) 353-2196
edmund.lacour@alabamaag.gov

*Counsel for State of Alabama*

TREG TAYLOR
Attorney General
JEFFREY G. PICKET
Senior Assistant Attorney General
BENJAMIN HOFMEISTER
Assistant Attorney General

Alaska Department of Law
123 4th Street
Juneau, AK 99801
(907) 269-5275
jeff.pickett@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI
Solicitor General
DYLAN JACOBS
Deputy Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*

ASHLEY MOODY
Attorney General
HENRY C. WHITAKER
Solicitor General

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, FL 32399-1050
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for State of Florida*

CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY
Solicitor General
Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

RAÚL R. LABRADOR
Attorney General
JOSH TURNER
Acting Solicitor General

Idaho Attorney General's Office
700 W. Jefferson Street, Suite 210
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
josh.turner@ag.idaho.gov

*Counsel for State of Idaho*

BRENNA BIRD
Attorney General
ERIC H. WESSAN
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, IA 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

THEODORE E. ROKITA
Attorney General
JAMES A. BARTA
Solicitor General

Indiana Attorney General's Office
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
james.barta@atg.in.gov

*Counsel for State of Indiana*

KRIS W. KOBACH
Attorney General
ANTHONY J. POWELL
Solicitor General
JESSE A. BURRIS
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Ave, 2nd Floor
Topeka, KS 66612
(785) 296-2215
anthony.powell@ag.ks.gov
jesse.burris@ag.ks.gov

*Counsel for State of Kansas*

RUSSELL COLEMAN
Attorney General
MATTHEW F. KUHN
Solicitor General
LINDSEY KEISER
Assistant Attorney General

Kentucky Attorney General's
  Office
700 Capital Avenue, Suite 118
Frankfort, KY
(502) 696-5478
matt.kuhn@ky.gov
lindsey.keiser@ky.gov

*Counsel for Commonwealth of
  Kentucky*

LYNN FITCH
Attorney General
JUSTIN L. MATHENY
Deputy Solicitor General

Mississippi Attorney General's
Office P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE
Solicitor General
MARIA A. LANAHAN
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-3321
josh.divine@ago.mo.gov
maria.lanahan@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN
Solicitor General

Montana Department of Justice
215 N. Sanders St
Helena, MT 59601
(406) 444-2707
christian.corrigan@mt.gov

*Counsel for State of Montana*

MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON
Solicitor General

Nebraska Attorney General's
    Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for State of Nebraska*

JOHN M. FORMELLA
Attorney General
MARK W. DELL'ORFANO
Assistant Attorney General

New Hampshire Department of
    Justice
1 Granite Place
Concord, NH 03301
(603) 271-3650
mark.w.dellorfano@doj.nh.gov

*Counsel for State of New
Hampshire*

DREW H. WRIGLEY
Attorney General
PHILIP AXT
Solicitor General

North Dakota Attorney General's
    Office
600 E Boulevard Ave, Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.govctitus@nd.gov

*Counsel for State of North Dakota*

DAVE YOST
Attorney General
T. ELLIOT GAISER
Solicitor General
MATHURA J. SRIDHARAN
Deputy Solicitor General

Ohio Attorney General's Office
30 E. Broad St, 17th Fl.
Columbus, OH 43215
(614) 728-7511
thomas.gaiser@OhioAGO.gov
mathura.sridharan@OhioAGO.gov

*Counsel for State of Ohio*

GENTNER F. DRUMMOND
Attorney General
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation

Oklahoma Attorney General's
    Office
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
zach.west@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
Attorney General
THOMAS T. HYDRICK
Assistant Deputy Solicitor General

South Carolina Attorney General's
    Office
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

JONATHAN SKRMETTI
Attorney General and Reporter
GABRIEL KRIMM
Assistant Solicitor General

Office of the Attorney General and
    Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 532-5596
gabriel.krimm@ag.tn.gov

*Counsel for State of Tennessee*

PATRICK MORRISEY
Attorney General
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General

West Virginia Attorney General's
    Office
State Capitol Complex, Bldg. 1,
    Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
(681) 313-4550
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

Bridget Hill
Attorney General
Ryan Schelhaas
Chief Deputy Attorney General

Office of the Wyoming Attorney
  General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

F. Scott Flow
Flow Law Firm, PLLC
800 SW 9th Avenue
Amarillo, Texas 79101-3206
(806) 372-2010
fsflow@flowlaw.com

*Co-Counsel for Appellants Except
States of Texas, Tennessee*

# CERTIFICATE OF INTERESTED PERSONS

### *State of Utah, et al. v. Su, et al.*
### No. 23-11097

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

The following are Plaintiffs-Appellants:

1.   Liberty Energy Inc. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2.   Liberty Oilfield Services LLC. It is a subsidiary of Liberty Energy Inc.

3.   Western Energy Alliance. It is a tax-exempt business league under 26 U.S.C. § 501(c)(6).

4.   James R. Copland

5.   Alex L. Fairly

6.   State of Utah

7.   State of Texas

8.   Commonwealth of Virginia

9.   State of Louisiana

10.  State of Alabama

11.  State of Alaska

12.  State of Tennessee

13.  State of Arkansas

14.  State of Florida

15.  State of Georgia

16.  State of Indiana

17.  State of Idaho

18.  State of Iowa

19.  State of Kansas

20.  Commonwealth of Kentucky

21.  State of Mississippi

22.  State of Missouri

23.  State of Montana

24.  State of Nebraska

25.  State of New Hampshire

26.  State of North Dakota

27.  State of Ohio

28. State of Oklahoma

29. State of South Carolina

30. State of West Virginia

31. State of Wyoming

The following are Defendants-Appellees:

32. Julie A. Su is a defendant in her official capacity. She is the Acting Secretary of the U.S. Department of Labor.

33. The U.S. Department of Labor

The following are counsel for Plaintiffs-Appellants:

34. Boyden Gray PLLC: Jonathan Berry, R. Trent McCotter, Michael B. Buschbacher, Jared M. Kelson, Andrew W. Smith, and Caleb Orr.

35. Fusion Law, PLLC: Brunn (Beau) Roysden.

36. Flow Law Firm: F. Scott Flow.

37. Hamilton Lincoln Law Institute: Neville Hedley and Anna St. John.

38. Utah Attorney General's Office: Sean Reyes, Melissa A. Holyoak, and Christopher A. Bates.

39. Texas Office of the Attorney General: Ken Paxton, Brent Webster, Grant Dorfman, Ralph Molina, Monroe David Bryant, and Zachary Berg.

40. Virginia Attorney General's Office: Jason Miyares, Andrew N. Ferguson, and Kevin M. Gallagher.

41. Louisiana Department of Justice: Liz Murrill, Joseph S. St. John, Tracy Short, Morgan Brungard.

42. Alabama Attorney General's Office: Steve Marshall and Edmund LaCour.

43. Alaska Department of Law: Treg Taylor, Jeffrey G. Picket, and Benjamin Hofmeister.

44. Office of the Attorney General and Reporter of Tennessee: Jonathan Skrmetti and Gabriel Krimm.

45. Arkansas Attorney General's Office: Tim Griffin, Nicholas J. Bronni, and Dylan Jacobs.

46. Office of the Florida Attorney General: Ashley Moody and Henry C. Whitaker.

47. Georgia Department of Law: Christopher M. Carr and Stephen J. Petrany.

48. Indiana Attorney General's Office: Theodore E. Rokita and James A. Barta.

49. Idaho Attorney General's Office: Raul R. Labrador and Josh Turner.

50. Iowa Attorney General's Office: Brenna Bird and Eric H. Wessan.

51. Kansas Attorney General's Office: Kris W. Kobach, Anthony J. Powell, and Jessee A. Burris.

52. Kentucky Attorney General's Office: Russell Coleman, Matthew F. Kuhn, and Lindsey Keiser.

53. Mississippi Attorney General's Office: Lynn Fitch, Scott G. Stewart, and Justin L. Matheny.

54. Missouri Attorney General's Office: Andrew Bailey, Joshua Divine, and Maria A. Lanahan.

55. Montana Department of Justice: Austin Knudsen and Christian B. Corrigan.

56. Nebraska Attorney General's Office: Michael T. Hilgers and Eric J. Hamilton.

57.  New Hampshire Department of Justice: John M. Formella and Mark W. Dell'Orfano.

58.  North Dakota Attorney General's Office: Drew H. Wrigley and Phillip Axt.

59.  Ohio Attorney General's Office: Dave Yost, T. Elliot Geiser, and Mathura J. Sridharan.

60.  Oklahoma Attorney General's Office: Genter F. Drummond, Garry M. Gaskins, II, and Zach West.

61.  South Carolina Attorney General's Office: Alan Wilson and Thomas T. Hydrick.

62.  West Virginia Attorney General's Office: Patrick Morrisey, Lindsay S. See, and Michael R. Williams.

63.  Office of the Wyoming Attorney General: Bridget Hill and Ryan Schelhaas.

Counsel for the Defendants-Appellees:

64.  U.S. Department of Justice: Daniel Winik, Brian M. Boynton, Brad P. Rosenberg, Leslie Cooper Vigen, and Cassandra Snyder.

Dated: January 25, 2024

/s/ Jonathan Berry
JONATHAN BERRY
Boyden Gray PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(202) 955-0620

# **REQUEST FOR ORAL ARGUMENT**

Pursuant to <u>Federal Rule of Appellate Procedure 34(a)</u> and (f) and Fifth Circuit Rule 28.2.3, Appellants respectfully request oral argument. This case involves important issues of statutory interpretation and administrative law. Oral argument would substantially aid the Court in its resolution of the case.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ix

TABLE OF AUTHORITIES ....................................................................x

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF THE CASE ..............................................................8

    A.    Background ................................................................8

        1.    ERISA and Its Fiduciary Duties...................................8

        2.    Changing DOL Positions .................................11

        3.    The 2022 Rule ........................................16

    B.    Procedural History ................................................21

SUMMARY OF THE ARGUMENT ........................................23

STANDARD OF REVIEW....................................................24

ARGUMENT ..................................................................25

    I.    The 2022 Rule's Tiebreaker Provision Violates ERISA. ......25

        A.    The 2022 Rule is Contrary to Law...............................25

        B.    Past Practice Doesn't Justify Collateral Tiebreakers . 42

        C.    The District Court Erred in Relying on *Chevron*. .......46

    II.    The 2022 Rule Is Arbitrary and Capricious. ........................50

        A.    The 2022 Rule Is Internally Inconsistent and Unreasonable. ..........................................51

        B.    The 2022 Rule Considered Improper Factors. ............53

        C.    The 2022 Rule Failed to Consider Important Aspects of the Problem or Justify the Agency's Departure from Past Factual Findings. ........................56

    III.    Appellants Have Standing. ...............................59

CONCLUSION ..................................................................62

CERTIFICATE OF SERVICE..................................................71

CERTIFICATE OF COMPLIANCE..........................................72

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) ........................................ 51

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ................................................. 36, 40

*Blankenship v. Boyle,*
329 F. Supp. 1089 (D.D.C. 1971) .................................... 34

*BST Holdings v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ........................................... 60

*Bussian v. RJR Nabisco,*
223 F.3d 286 (5th Cir. 2000) ........................................... 27

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.,*
472 U.S. 559 (1985) ....................................................... 31

*Chamber of Com. of U.S. v. SEC,*
85 F.4th 760 (5th Cir. 2023) ........................................... 57

*Chemehuevi Tribe v. Fed. Power Comm'n,*
420 U.S. 395 (1975) ....................................................... 45

*Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.,*
467 U.S. 837 (1984).........................7, 22, 24, 46, 47, 48, 49

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
779 F.3d 258 (5th Cir. 2015) ........................................... 60

*Ctr. for Auto Safety v. Ruckelshaus,*
747 F.2d 1 (D.C. Cir. 1984) ........................................... 45

*Data Mktg. P'ship, LP v. DOL,*
45 F.4th 846 (5th Cir. 2022) ........................................ 24, 51

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ............................................................. 61

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................ 57, 58

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) ..................................................... 33

*Erlenbaugh v. United States*,
409 U.S. 239 (1972) ................................................................. 35

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................... 50, 59

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ............................................................. 50

*Fulton Nat'l Bank v. Tate*,
363 F.2d 562 (5th Cir. 1966) ................................................... 33

*Gutierrez-Brizuela v. Lynch*,
834 F.3d 1142 (10th Cir. 2016) ............................................... 49

*Halperin v. Richards*,
7 F.4th 534 (7th Cir. 2021) ........................................... 27, 28, 33

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) .............................................................. 28

*K.P. v. LeBlanc*,
627 F.3d 115 (5th Cir. 2010) ................................................... 60

*Loper Bright Enterprises v. Raimondo*
(U.S. No. 22-451) ..................................................................... 49

*Louisiana v. U.S. Dep't of Energy*,
No. 22-60146, 2024 WL 80398 (5th Cir. Jan. 8, 2024) ....... 8, 51, 58, 59

*Martinez v. Schlumberger, Ltd.*,
338 F.3d 407 (5th Cir. 2003) ................................................... 32

*McDonald v. Provident Indem. Life Ins. Co.,*
60 F.3d 234 (5th Cir. 1995) ............................................................ 55

*MCI Telecommc'ns Corp. v. AT&T,* 512 U.S. 218 (1994) ...................... 41

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................... 50, 53, 54

*Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.,*
545 U.S. 967, 1017 n.12 (2005) .......................................... 52

*NFIB v. DOL,*
595 U.S. 109 (2022) ........................................................... 41

*NLRB v. Amax Coal Co.,*
453 U.S. 322 (1981) ............................... 4, 27, 34, 35, 36, 43

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92 (2015) ........................................................... 51

*Pub. Emps. Ret. Sys. of Ohio v. Betts,*
492 U.S. 158 (1989) ........................................................... 43

*Relentless, Inc. v. Dep't of Com.*
(U.S. No. 22-1219) ........................................................... 49

*Rumsfeld v. F. for Acad. and Institutional Rts., Inc.,*
547 U.S. 47 (2006) ....................................................... 59, 62

*Sackett v. EPA,*
598 U.S. 651 (2023) ........................................................... 45

*Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan,*
960 F.3d 190 (5th Cir. 2020) ................................... 3, 29, 31

*Sierra Club v. EPA,*
939 F.3d 649 (5th Cir. 2019) ............................................. 50

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944) ........................................................... 43

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ...................................................... 30

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021) ............................................... 61

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ........................................................ 59, 60

*Tibble v. Edison Int'l*, 575 U.S. 523 (2015) ................................................................. 31

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ............................................................... 32

*United States v. Home Concrete & Supply, LLC*, 566 U.S. 478 (2012) ............................................................... 52

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ............................................................... 45

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ............................................ 4, 36, 38, 39, 41, 42

*Wong v. N.Y.C Emps. Ret. Sys.*, No. 652297/2023 (N.Y. Supreme Ct. filed May 11, 2023) .................. 38

**Statutes**

5 U.S.C. § 706 ............................................................. 21, 25, 50

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 1346 ................................................................. 1

28 U.S.C. § 1361 ................................................................. 1

28 U.S.C. § 2201 ................................................................. 1

29 U.S.C. § 1001 .......................................................................... 8, 54

29 U.S.C. § 1002 ................................................................................ 9

29 U.S.C. § 1103 .................................2, 3, 9, 10, 25, 27, 28, 31, 39, 47

29 U.S.C. § 1104 ..................................2, 3, 10, 11, 25, 27, 29, 31, 39, 47

29 U.S.C. § 1107 .............................................................................. 28

29 U.S.C. § 1108 .............................................................................. 27

Employee Retirement Income Security Act of 1974,
    Pub. L. No. 93-406, 88 Stat. 829 .............................................. 2

National Labor Relations Act, 29 U.S.C. § 151 et seq ......................... 34

**Bills**

H.R.J. Res. 30, 118th Cong. (2023) ................................................ 5, 38, 45

Freedom to Invest in a Sustainable Future Act,
    S. 523, 118th Cong. (2023) ...................................................... 4, 38

Retirees Sustainable Investment Opportunities Act of
    2021, H.R. 3604, 117th Cong. .................................................. 38

Financial Factors in Selecting Retirement Plan Investments Act,
    H.R. 3387, 117th Cong. (2021) ................................................ 38

Retirees Sustainable Investment Policies Act of 2020,
    H.R. 8959, 116th Cong. (2020) ................................................ 38

**Regulatory Materials**

*IB 94-1,*
    59 Fed. Reg. 32,606 (June 23, 1994) ........................................ 11, 43

*IB 94-2,*
    59 Fed. Reg. 38,860 (July 29, 1994) ........................................ 12

*IB 2008-02,*
    73 Fed. Reg. 61,731 (Oct. 17, 2008) ........................................ 13

*IB 2008-01,*
73 Fed. Reg. 61,734 (Oct. 17, 2008) .................................. 12, 15, 44, 49

*IB 2015-01,*
80 Fed. Reg. 65,135 (Oct. 26, 2015) .............................................. 13, 14

*IB 2016-01,*
81 Fed. Reg. 95,879 (Dec. 29, 2016).................................................... 14

*Financial Factors in Selecting Plan Investments,*
85 Fed. Reg. 39,113 (proposed June 30, 2020) ....................... 15, 40, 44

*Financial Factors in Selecting Plan Investments,*
85 Fed. Reg. 72,846 (Nov. 13, 2020) ....14, 15, 16, 44, 45, 49, 54, 58, 59

*Fiduciary Duties Regarding Proxy Voting and Shareholder Rights,*
85 Fed. Reg. 81,658 (Dec. 16, 2020)................................. 14, 16, 58, 59

*Prudence and Loyalty in Selecting Plan Investments and*
*Exercising Shareholder Rights,*
86 Fed. Reg. 57,272 (proposed Oct. 14, 2021) ................................... 18

*Prudence and Loyalty in Selecting Plan Investments and Exercising*
*Shareholder Rights,* 87 Fed. Reg. 73,822 (Dec. 1, 2022) .......... 2–8, 16,
18–22, 24, 25, 29, 34, 36–39, 42, 47–54, 56, 57, 60

9 C.F.R. § 2550.404a-1 ........................................................................ 19

## Executive Orders

Executive Order 13990, Protecting Public Health and the
Environment and Restoring Science to Tackle the Climate Crisis,
86 Fed. Reg. 7,037 (Jan. 25, 2021)......................................... 16, 17, 18

Executive Order 14030, Climate-Related Financial Risk,
86 Fed. Reg. 27,967 (May 25, 2021) .................................................. 18

## Other Authorities

American Heritage Dictionary of the English Language (1969)............ 26

Anita S. Krishnakumar, *Longstanding Agency Interpretations*,
 83 Fordham L. Rev. 1823 (2015) ........................................ 42

Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012) .................. 28

Austin Wakeman Scott & William Franklin Fratcher,
 *The Law of Trusts* (4th ed. 1987) ........................................ 32

Black's Law Dictionary (11th ed. 2019) ................................... 26

Brett M. Kavanaugh, *Fixing Statutory Interpretation*,
 129 Harv. L. Rev. 2118 (2016) ...................................... 46, 47

Edward A. Zelinsky, *ETI, Phone the Department of Labor:*
 *Economically Targeted Investments, IB 94-1 and the*
 *Reincarnation of Industrial Policy*,
 16 Berkeley J. Emp. & Lab. L. 333 (1995) ......................... 12

*ESG Investing*, Harvard Advanced Leadership Initiative:
 Soc. Impact Rev. (Jan 24, 2023),
 https://www.sir.advancedleadership.harvard.edu/articles/
 politicization-of-esg-investing ........................................... 37

Emp. Benefits Sec. Admin., DOL, *FY 2023 Congressional*
 *Budget Justification* .......................................................... 37

Emp. Benefits Sec. Admin., DOL, *Statement Regarding*
 *Enforcement of its Final Rules on ESG Investments and Proxy*
 *Voting by Employee Benefit Plans* (Mar. 10, 2021) ............. 17

Felix Frankfurter, *Some Reflections on the Reading of Statutes*,
 47 Colum. L. Rev. 527, 537 (1947) ................................... 32

*Hearings on H.R. 1045, H.R. 1046, and H.R. 16462 Before*
 *the Gen. Subcomm. on Lab. of the H. Comm. on Educ. and*
 *Lab.*, 91st Cong. (1973) ...................................................... 8

*Welfare and Pension Plan Legislation: Hearings on H.R. 2*
 *and H.R. 462 Before the Gen. Subcomm. on Lab. of the*
 *H. Comm. on Educ. and Labor*, 93d Cong. 260 (1973) ......... 31

*How ESG Became Part of America's Culture Wars*, The
    Economist (June 21, 2023), https://www.economist.com/
    the-economist-explains/2023/06/21/how-esg-became-part-
    of-americas-culture-wars .................................................. 38

James D. Hutchinson & Charles G. Cole, *Legal Standards
    Governing Investment of Pension Assets for Social and
    Political Goals*, 128 U. Pa. L. Rev. 1340 (1980) .................... 30, 31, 38

Jean-Pierre Aubry et al., *ESG Investing and Public Pensions:
    An Update*, Ctr. for Ret. Rsch. at Bos. Coll., State & Local
    Pension Plans No. 74 (Oct. 2020) ....................................... 37

John J. Topoleski & Elizabeth A. Myers, CRS, R46366, Single-
    Employer Defined Benefit Pension Plans: Funding Relief
    and Modifications to Funding Rules (2023) ......................... 9

John J. Topoleski & Elizabeth A. Myers, CRS, R47152,
    Private-Sector Defined Contribution Pension Plans:
    An Introduction (2022) ...................................................... 9

Merriam-Webster Dictionary Online, https://www.merriam-
    webster.com/dictionary/solely.......................................... 26

Oxford Student's Dictionary of American English (1st ed. 1983) .......... 26

Restatement (Second) of Trusts (1959)........................................ 31, 32

Restatement (Third) of Trusts (2007) ......................................... 32, 33

White House, *Fact Sheet: List of Agency Actions for Review*
    (Jan. 20, 2021), https://www.whitehouse.gov/briefing-
    room/statements-releases/2021/01/20/fact-sheet-list-of-
    agency-actions-for-review/ ................................................ 17

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 5 U.S.C. §§ 701–706, 28 U.S.C. §§ 1331, 1346, 1361, 2201, and the U.S. Constitution. The District Court granted Appellees' motion for summary judgment on September 21, 2023. Appellants timely filed a notice of appeal with this Court on October 26, 2023. *See* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the tiebreaker provision of the Department of Labor's new rule, *Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights*, 87 Fed. Reg. 73,822 (Dec. 1, 2022), violates the Employee Retirement Income Security Act of 1974.

2. Whether the Department of Labor's new rule is arbitrary and capricious.

**<u>INTRODUCTION</u>**

The Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, <u>88 Stat. 829</u>, safeguards the "retirement income" of 158 million workers and nearly $13 trillion in assets. It provides that those assets "shall be held [in trust] for the exclusive purposes of providing benefits to participants in the [retirement] plan and their beneficiaries and defraying reasonable expenses of administering the plan." <u>29 U.S.C. § 1103(a)</u>, <u>(c)(1)</u>. Plan fiduciaries must similarly act "solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1). The Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer* unanimously held that the term "benefits" "must be understood to refer to the sort of *financial* benefits (such as retirement income)" that ERISA exists to secure and "does not cover nonpecuniary benefits." <u>573 U.S. 409, 421</u> (2014). Thus, fiduciaries must act for the sole and exclusive purpose of securing the retirement savings of plan participants and beneficiaries.

On December 1, 2022, the Department of Labor finalized *Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder*

*Rights*, 87 Fed. Reg. 73,822 ("2022 Rule"), to amend its regulations under ERISA. The 2022 Rule provides fiduciaries with greater flexibility to consider "collateral" (i.e., non-pecuniary) factors—putatively as a tiebreaker—when selecting investment options for retirement plans subject to ERISA. Among other things, it also removed from the regulation all uses of the terms "pecuniary" and "non-pecuniary," and a documentation requirement that applied whenever fiduciaries invoke the tiebreaker provision. The 2022 Rule was explicit about its intent to remove a "chill" on environmental, social, and governance ("ESG") investment objectives and regulatory provisions that might lead to lawsuits over their consideration.

The 2022 Rule is unlawful. Allowing consideration of collateral factors as a tiebreaker violates ERISA because fiduciaries must act "solely" and "for the exclusive purpose" of providing financial benefits to plan participants. 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A). These duties are "derived from the common law of trusts and are the highest known to the law." *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190, 194 (5th Cir. 2020) (cleaned up). Fiduciaries cannot serve two masters, no matter how limited or (allegedly) benign the circumstances.

The Supreme Court in *Dudenhoeffer* has already emphasized that ERISA requires fiduciaries to act in the financial interests of plan participants. 573 U.S. at 421. And it has read nearly identical language to prohibit collateral considerations, even when doing so ostensibly wouldn't harm plan participants at all. *See NLRB v. Amax Coal Co.*, 453 U.S. 322 (1981). When Congress has allowed fiduciaries to act with an eye toward collateral considerations, it has been explicit, but no such exceptions apply here.

The prohibition on collateral considerations as a tiebreaker is reinforced by the major-questions doctrine, which requires agencies to identify clear statutory authority for regulations of vast economic and political significance. *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022). ERISA applies to trillions of dollars in retirement savings across nearly the entire U.S. population. Pursuit of collateral benefits with that enormous sum of money—especially ESG objectives—is the subject of intense political debate, and Congress has repeatedly failed to adopt bills that would allow such investing with ERISA funds. *See, e.g.*, The Freedom to Invest in a Sustainable Future Act, S. 523, 118th Cong. (2023). Indeed, the 2022 Rule itself was subject to a bipartisan resolution

under the Congressional Review Act, which would have invalidated the 2022 Rule but for a presidential veto. H.R.J. Res. 30, 118th Cong. (2023). That alone should give courts pause before interpreting the statute to allow expansive agency power.

DOL cannot identify clear statutory authority for the tiebreaker provision of the 2022 Rule. It is no defense that DOL has previously blessed tiebreakers because past practice cannot defeat the plain language of ERISA as interpreted by the Supreme Court. Moreover, the tiebreaker provision has always been controversial and thus does not reflect any settled understanding of ERISA. The first comprehensive guidance emerged two decades after Congress passed ERISA, and nowhere in that document did DOL grapple with ERISA's text and structure, the underlying trust law, or the duty to diversify. It wasn't until 2020 that DOL recognized tiebreakers in a rulemaking for the first time, and even then only in more limited circumstances while questioning their legality altogether.

The 2022 Rule is also arbitrary and capricious for at least three reasons. *First*, the 2022 Rule is internally inconsistent and unreasonable. DOL posits the need for tiebreakers, but then concedes that "no two

investments are the same in each and every respect," 87 Fed. Reg. at 73,836, meaning there are always ways to distinguish investments other than by introducing collateral considerations. DOL also deleted all use of the "pecuniary/non-pecuniary distinction," *id.* at 73,834, despite the Supreme Court's clear statement in *Dudenhoeffer* that ERISA prohibits consideration of "nonpecuniary benefits." 573 U.S. at 421.

*Second*, the 2022 Rule relies on factors Congress never intended DOL to consider. It expanded the definition of a "tie" and removed documentation requirements to shield fiduciaries from the burdens of scrutiny and litigation and clear the way for collateral considerations. That is not a proper purpose under ERISA, which expressly says that its sole purpose is to protect plan participants, not fiduciaries. This inversion of fiduciaries' interests over those of plan participants permeated the rulemaking process. DOL repeatedly emphasized the supposed need to ease the burdens on fiduciaries to consider ESG and other collateral factors, and went so far as to codify that ESG considerations can be permissible, rather than emphasizing the need to focus solely and exclusively on maximizing benefits for plan participants.

*Third*, the 2022 Rule failed to consider important aspects of the problem. DOL never reckoned with the reality that the 2022 Rule now requires sponsors and participants to spend additional resources to monitor fiduciaries. It also failed to acknowledge and confront its past finding that generic recitations of the fiduciary duties in sections 403 and 404 of ERISA were insufficient to protect participants and their retirement income, especially in the context of ESG. From expanding the tiebreaker provision, to removing documentation requirements, to lifting other restrictions meant to protect the retirement income of participants and beneficiaries, the 2022 Rule systematically expands the ability of fiduciaries to consider ESG with limited oversight.

These errors require reversal. Rather than follow the plain language of ERISA and apply the major-questions doctrine, the District Court held incorrectly that the statute is silent about using collateral considerations as a tiebreaker, then deferred to DOL and its past practice under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* ROA.2293–97. The District Court also glossed over DOL's failure to engage in reasoned decision-making, accepting superficial justifications while ignoring the agency's inconsistent

explanations, impermissible considerations, and failure to consider important aspects of the problem. ROA.2297–302.

While arbitrary-and-capricious review may be deferential to federal agencies, it is not "toothless." *Louisiana v. U.S. Dep't of Energy*, No. 22-60146, 2024 WL 80398, at \*5 (5th Cir. Jan. 8, 2024) (cleaned up). Instead, "it has serious bite." *Id.* (cleaned up). This Court should reverse with instructions to vacate the 2022 Rule.

## STATEMENT OF THE CASE

### A.   BACKGROUND

#### 1.   ERISA AND ITS FIDUCIARY DUTIES

Congress passed ERISA in 1974 to ensure that "disclosure be made and safeguards be provided" to protect the retirement savings of America's workers. 29 U.S.C. § 1001(a). The legislation followed a decade of investigations and hearings about plan fiduciaries who "subordinated the interests of participants to their own interests or to those of the employing company." *Private Welfare and Pension Plan Legislation: Hearings on H.R. 1045, H.R. 1046, and H.R. 16462 Before the Gen. Subcomm. on Lab. of the H. Comm. on Educ. and Lab.*, 91st Cong. 470–72 (1973) (statement of George P. Shultz, Sec'y of Lab.) (collecting

examples).

ERISA applies to two types of pension plans: (1) defined benefit plans, which are traditional pensions; and (2) defined contribution plans, also called "individual account plan[s]." *See* 29 U.S.C. § 1002(34), (35).[1] Plan sponsors—often an employer or group of employers—are typically responsible for the management of plan assets and choosing the investments that will be offered to participants with individual account plans. *See id.* § 1002(16). If they do not manage investment plans directly, plan sponsors may hire investment managers to perform those tasks. *Id.* Both are fiduciaries under ERISA. *See id.* § 1002(21)(A).

To prevent the misuse of retirement funds, ERISA codified a strict duty of loyalty for fiduciaries. Section 403 requires that retirement-plan assets must "be held for the *exclusive* purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of" the plan. 29 U.S.C. § 1103(c)(1) (emphasis added). Section

---

[1] *See also* John J. Topoleski & Elizabeth A. Myers, Cong. Rsch. Serv. ("CRS"), R46366, Single-Employer Defined Benefit Pension Plans: Funding Relief and Modifications to Funding Rules 1–2 (2023), https://crsreports.congress.gov/product/pdf/R/R46366; John J. Topoleski & Elizabeth A. Myers, CRS, R47152, Private-Sector Defined Contribution Pension Plans: An Introduction 1–2 (2022), https://crsreports.congress.gov/product/pdf/R/R47152. ERISA also applies to employee welfare benefit plans. *See* 29 U.S.C. § 1002(1).

404 similarly requires that plan fiduciaries act "*solely* in the interest of the participants and beneficiaries" and "for the *exclusive* purpose of providing benefits to participants and beneficiaries" and defraying administrative costs. *Id.* § 1104(a)(1) (emphases added).

These provisions include limited exceptions. Section 403 permits plan managers to return contributions, even to non-beneficiaries, that were made by mistake. 29 U.S.C. § 1103(c)(2)–(3). And both sections allow fiduciaries to dispose of plan assets in accordance with the statutory procedures for plan termination. *Id.* §§ 1103(d), 1104(a)(1). The fact that such innocuous actions—even when explicitly allowed elsewhere in ERISA—still needed express carveouts from the strict fiduciary duties in sections 403 and 404 shows how strong and comprehensive these fiduciary duties are. Nowhere does ERISA say that fiduciaries may consider collateral factors, especially in the interests of third parties or society at large. That, after all, would be the opposite of ERISA's "sole" and "exclusive purpose."

ERISA also requires that fiduciaries act with due care, meaning "with the care, skill, prudence, and diligence ... that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C.

§ 1104(a)(1)(B). And they must diversify the plan's investments "so as to minimize the risk of large losses," unless doing so would not be prudent. *Id.* § 1104(a)(1)(C).

## 2. CHANGING DOL POSITIONS

In 1994, twenty years after Congress passed ERISA, DOL issued an interpretive bulletin about investment decisions that consider collateral factors. IB 94-1, 59 Fed. Reg. 32,606 (June 23, 1994). DOL noted that a "perception exists" that any investments made in part for collateral benefits violate the duty of loyalty in sections 403 and 404. *Id.* at 32,606. DOL acknowledged that the duty of loyalty "prohibit[s] a fiduciary from subordinating" the retirement plan's bottom line "to unrelated objectives," but continued to say that when "choosing between investments that have comparable risks and rates of return," fiduciaries "may consider collateral benefits." *Id.* at 32,607. DOL justified this tiebreaker principle by citing its own previous opinion letters that had permitted, for example, a retirement fund for union workers to consider investment options that might provide collateral benefits to the areas where those union workers lived. *Id.* at 32,606–07. At least one legal scholar noted at the time that this tiebreaker concept was contrary to the

text of ERISA. Edward A. Zelinsky, *ETI, Phone the Department of Labor: Economically Targeted Investments, IB 94-1 and the Reincarnation of Industrial Policy*, 16 Berkeley J. Emp. & Lab. L. 333, 344 (1995).

DOL issued another interpretive bulletin later that year with guidance on how fiduciaries should use their power to exercise the proxy rights of corporate stock held by retirement plans. IB 94-2, 59 Fed. Reg. 38,860 (July 29, 1994). DOL explained that fiduciaries must adhere to ERISA's duties to "not subordinate the interests of the participants and beneficiaries to unrelated objectives" in their proxy voting decisions. *Id.* at 38,861.

In 2008, DOL backtracked from these positions. In a new interpretive bulletin, DOL reminded fiduciaries that "ERISA's plain text does not permit fiduciaries to make investment decisions on the basis of any factor other than the economic interest of the plan." IB 2008-01, 73 Fed. Reg. 61,734, 61,735 (Oct. 17, 2008). But DOL acknowledged that it had "recognized in past guidance" that tiebreakers were permissible, and thus DOL decided to permit the consideration of collateral factors as a tiebreaker when the investment choices were "economically indistinguishable." *Id.* "A less rigid rule" than requiring economic parity,

DOL noted, "would render [ERISA]'s tight limits on the use of plan assets illusory." *Id.* at 61,735. DOL then added that fiduciaries who rely on collateral considerations "will rarely be able to demonstrate compliance with ERISA absent a written record demonstrating … that the investment alternatives were of equal value." *Id.* at 61,735–36.

At the same time, DOL also narrowed its policy on exercising proxy rights. IB 2008-02, 73 Fed. Reg. 61,731 (Oct. 17, 2008). DOL emphasized that when voting proxies, ERISA requires that "the responsible fiduciary shall consider only those factors that relate to the economic value of the plan's investment and shall not subordinate the interests of the participants and beneficiaries in their retirement income to unrelated objectives." *Id.* And this time, DOL made perfectly clear that fiduciaries who "further policy or political issues through proxy resolutions that have no connection to enhancing the economic value of the plan's investment … would, in the view of [DOL], violate the prudence and exclusive purpose requirements of" ERISA. *Id.* at 61,734.

In 2015, DOL changed its tiebreaker policy yet again with another interpretive bulletin. IB 2015-01, 80 Fed. Reg. 65,135 (Oct. 26, 2015). While DOL noted its "consistent view" that ERISA prohibits fiduciaries

from subordinating the financial interests of the plan to collateral considerations, it reaffirmed that "fiduciaries may consider such collateral goals as tie-breakers." *Id.* at 65,136. DOL explained that the 2008 guidance caused confusion when it "set[] a higher but unclear standard" for compliance with the tiebreaker provision. *Id.* DOL thus revoked the 2008 interpretive bulletin on tiebreakers and returned to the 1994 guidance. *Id.*

The next year DOL similarly loosened the standard for fiduciaries exercising proxy rights. IB 2016-01, 81 Fed. Reg. 95,879 (Dec. 29, 2016). DOL worried that the 2008 guidance on proxy voting was "out of step with important domestic and international trends in investment management" that involved considering "difficult to quantify" factors like "climate and sustainability issues." *Id.* at 95,881–82. As a result, DOL withdrew the 2008 interpretive bulletin on exercising proxy rights and reinstated the 1994 guidance with minor changes. *Id.*

In 2020, DOL took a different approach and engaged in notice-and-comment rulemaking. *Financial Factors in Selecting Plan Investments*, 85 Fed. Reg. 72,846 (Nov. 13, 2020); *Fiduciary Duties Regarding Proxy Voting and Shareholder Rights*, 85 Fed. Reg. 81,658 (Dec. 16, 2020)

(collectively, "2020 Rules"). DOL acknowledged that the "varied statements" in past guidance had contributed to confusion, and expressed concern that fiduciaries were making "investment decisions for purposes distinct from providing benefits to participants." *Id.* at 72,848. And while DOL ultimately "carried forward" the tiebreaker principle from previous guidance, it did so only after both casting doubt on the idea that a tie could exist at all and noting that "enhanced scrutiny" was necessary for the tiebreaker because of its tension with "trust fiduciary law." 85 Fed. Reg. at 72,860–61; *see also Financial Factors in Selecting Plan Investments*, 85 Fed. Reg. 39,113, 39,123 (proposed June 30, 2020) (requesting comment on whether the tiebreaker "should be abandoned as inconsistent with the fiduciary duties of ERISA Section 404").

Motivated by these concerns, DOL placed significant guardrails around collateral considerations. The 2020 Rules permitted consideration of collateral factors as a tiebreaker only when "the plan fiduciary is unable to distinguish" between available investments "on the basis of pecuniary factors alone," 85 Fed. Reg. at 72,884, echoing the "economically indistinguishable" standard from the 2008 guidance, 73 Fed. Reg. at 61,735. The 2020 Rules also required fiduciaries invoking

the tiebreaker provision to specifically document "[w]hy pecuniary factors were not sufficient to select the investment or investment course of action," "[h]ow the selected investment compares to the alternative investments," and "[h]ow the chosen non-pecuniary factor or factors are consistent with the interests of participants and beneficiaries in their retirement income or financial benefits under the plan." 85 Fed. Reg. at 72,884.

The 2020 Rules similarly imposed stricter standards on how a fiduciary casts proxy votes, clarifying that "when exercising" shareholder rights, a fiduciary must act "solely in the interests of the participants" and not "promote non-pecuniary benefits or goals unrelated to those financial interests of the plan's participants." 85 Fed. Reg. at 81,694.

### 3.   THE 2022 RULE

Upon first taking office, President Biden signed Executive Order 13990 on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 25, 2021). That order announced a policy that included to:

- "protect our environment;"

- "hold polluters accountable, including those who disproportionately harm communities of color and low-income communities;"

- "reduce greenhouse gas emissions;"

- "bolster resilience to the impacts of climate change;" and

- "prioritize both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals."

*Id.* § 1, 86 Fed. Reg. at 7,037. It then directed agency heads to consider "suspending, revising, or rescinding" any agency actions during the Trump Administration that were inconsistent with, or presented obstacles to, the new policies. *Id.* § 2, 86 Fed. Reg. at 7,037. An accompanying Fact Sheet specifically directed DOL to review aspects of the 2020 Rules. White House, *Fact Sheet: List of Agency Actions for Review* (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.

In response, DOL announced that it would not enforce the 2020 Rules "until it publishe[d] further guidance." Emp. Benefits Sec. Admin., DOL, *Statement Regarding Enforcement of its Final Rules on ESG Investments and Proxy Voting by Employee Benefit Plans* (Mar. 10, 2021), https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/

erisa/statement-on-enforcement-of-final-rules-on-esg-investments-and-proxy-voting.pdf.

On May 20, 2021, President Biden signed Executive Order 14030 on Climate-Related Financial Risk, 86 Fed. Reg. 27,967 (May 25, 2021). That order announced a policy to mitigate risks arising from "[t]he failure of financial institutions to appropriately and adequately account for" climate change in their investment choices. *Id.* § 1, 86 Fed. Reg. at 27,967. It further directed DOL to consider rescinding, revising, or suspending the 2020 Rules. *Id.* § 4(b), 86 Fed. Reg. at 27,968–69.

DOL responded by proposing and finalizing the 2022 Rule, citing E.O. 13990, E.O. 14030, and the need to reduce "the chilling effect" caused by the 2020 Rules "with respect to the consideration of climate change and other ESG factors." 87 Fed. Reg. at 73,823, 73,826; *see also Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights*, 86 Fed. Reg. 57,272 (proposed Oct. 14, 2021).

The 2022 Rule made several significant changes relevant here. *First*, it expanded the tiebreaker provision beyond any of the previous definitions. DOL explained that the standard in the 2020 Rules was "impractical and unworkable" because "no two investments" are

identical, 87 Fed. Reg. at 73,836, but DOL continued that fiduciaries should be able to consider collateral factors whenever the options "equally serve the financial interests of the plan over the appropriate time horizon," *id.* at 73,885 (codified at 29 C.F.R. § 2550.404a-1(c)(2)). DOL also defended the tiebreaker provision on the ground that "ERISA does not specifically address" what fiduciaries should do when "multiple investment alternatives equally serve" plan participants. *Id.* at 73,836.

*Second*, the 2022 Rule removed all other uses of the terms "pecuniary" and "non-pecuniary" because of "concerns that the terminology causes confusion and a chilling effect to financially beneficial choices" that was "undermining the fundamental principle *Dudenhoeffer* expressed." *Id.* at 73,828, 73,834.

*Third*, the 2022 Rule removed the documentation requirements for fiduciaries who consider collateral benefits. DOL concluded that the requirements were "very likely to chill and discourage plan fiduciaries from using the tiebreaker test generally, including … consideration of ESG factors." *Id.* at 73,838. It explained that further safeguards were unnecessary because "the tiebreaker test, by its terms, applies only where competing investments equally serve the financial interests of the

plan." *Id.* And DOL was "wary" that documentation requirements would create "the potential for litigation" by drawing "potential litigants' attention to tie-breaker decisions as inherently problematic." *Id.*

The 2022 Rule similarly declined to add a disclosure requirement that DOL originally included as part of its notice of proposed rulemaking ("NPRM"). The NPRM for the 2022 Rule would have required fiduciaries who select investment options on the basis of a non-pecuniary consideration to prominently display the collateral characteristic in the disclosure materials. *Id.* at 73,839. In the 2022 Rule, however, DOL removed that provision in part because it "would effectively act as an invitation to litigation" by drawing "the reader's attention to the non-financial motives of the plan fiduciary." *Id.* at 73,840.

*Fourth*, the 2022 Rule eliminated restrictions on the selection of default investment options for participant-directed individual account plans, called qualified default investment alternatives ("QDIAs"), that expressly consider collateral factors. The change was out of concern that the limitation was "preclud[ing] fiduciaries from considering QDIAs that include ESG strategies, even where they were otherwise prudent or economically superior to competing options." *Id.* at 73,842–43.

*Fifth*, the 2022 Rule removed a provision that prohibited fiduciaries from using proxy votes to "promote benefits or goals unrelated to those financial interests of the plan's participants." *Id.* at 73,847. DOL concluded that this prohibition "serve[d] no independent function," given the 2022 Rule's other more general fiduciary requirements. *Id.* And DOL worried that the prohibition had been misunderstood to "impose … additional duties, with their attendant costs and potential for litigation." *Id.* at 73,848.

The 2022 Rule never reckoned with comments demonstrating that sponsors and participants will now be required to spend additional resources to monitor fiduciaries. Nor did DOL confront its past finding that generic recitations of fiduciary duty in its regulations (instead of strict, specific prohibitions) were insufficient to protect participants and their retirement income, especially in the context of ESG.

## B.   PROCEDURAL HISTORY

On January 26, 2023, Appellants filed suit in the Northern District of Texas to challenge the 2022 Rule, seeking declaratory and injunctive relief. The complaint alleged that the 2022 Rule violated ERISA and was arbitrary and capricious under the Administrative Procedure Act

("APA"), 5 U.S.C. § 706. On February 21, 2023, Appellants filed a motion for preliminary injunction. Following the government's response, the parties agreed to move under Federal Rule of Civil Procedure 65(a)(2) to consolidate trial on the merits with the preliminary injunction and thereafter submitted cross-motions for summary judgment.

On September 21, 2023, the District Court entered judgment for DOL. The District Court invoked *Chevron* and deferred to DOL's interpretation of ERISA, concluding that Congress had not spoken directly on the use of tiebreakers because the statute did not "contemplate the possibility of a 'tie' between two financially equivalent investment options." ROA.2294. The District Court then reasoned that the tiebreaker provision in the 2022 Rule is a reasonable interpretation of ERISA because there was little meaningful difference between it and the 2020 Rules and DOL has recognized tiebreakers in the past. ROA.2295. The District Court otherwise failed to consider Appellants' extensive statutory analysis, including the common law of trusts that informs ERISA's fiduciary duties.

The District Court also held that the 2022 Rule was not arbitrary and capricious. It concluded that changes to the tiebreaker were

reasonable because DOL had explained that the 2020 Rules caused confusion and had a chilling effect on ESG investing. ROA.2299. The District Court also reasoned that removal of the clear prohibition on considering collateral benefits when voting proxies was reasonable because DOL explained that it served no independent function but could be misunderstood to impose additional burdens. ROA.2300. And the District Court observed that DOL justified removing restrictions of QDIAs because ESG investments might otherwise be prudent. *Id.*

The District Court never addressed Appellants' argument below that removing the documentation requirement for tiebreakers was arbitrary and capricious. And the District Court used a footnote to dismiss Appellants' argument that DOL failed to consider the increased burden on plan sponsors and participants to monitor fiduciaries without clear standards and documentation requirements, confusingly citing Respondents' standing arguments. ROA.2301 n.7.

Appellants timely appealed.

## SUMMARY OF THE ARGUMENT

ERISA's duty of loyalty requires fiduciaries to act for the "sole" and "exclusive" financial benefit of plan participants. That plain statutory

text prohibits collateral considerations, especially in pursuit of benefits to third parties or society. Longstanding principles of trust law confirm that fiduciaries cannot make investment choices based on collateral factors even when doing so ostensibly would not harm plan participants. The District Court therefore erred by concluding that ERISA was silent on the question and applying *Chevron* deference.

The major questions doctrine reinforces this conclusion. If DOL wants to promulgate and maintain a rule substantially affecting the retirement savings of millions of Americans—especially after Congress repudiated it under the Congressional Review Act—DOL must show clear statutory authorization. It cannot do so.

The 2022 Rule is also arbitrary and capricious. It removed or weakened important safeguards to protect the retirement income of plan participants, offering inconsistent or unreasonable logic, relying on impermissible factors, and failing to consider that the changes make it harder for participants to monitor their fiduciaries.

## STANDARD OF REVIEW

This Court reviews summary judgement de novo. *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 853 (5th Cir. 2022). Agency action must

be set aside under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

### I. THE 2022 RULE'S TIEBREAKER PROVISION VIOLATES ERISA.

#### A. The 2022 Rule is Contrary to Law.

The APA directs courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2). Because ERISA prohibits fiduciaries from considering collateral considerations, even when investment options are economically comparable, the 2022 Rule's tiebreaker provision is contrary to law.

##### 1. *The text and structure of ERISA prohibit collateral considerations.*

ERISA imposes on fiduciaries a duty of loyalty, a duty of prudence, and a duty to diversify investments. 29 U.S.C. § 1104(a)(1)(A)–(C). The duty of loyalty requires fiduciaries to act "solely" and "for the exclusive purpose of" providing "benefits to participants and their beneficiaries." *Id.* §§ 1103(c)(1), 1104(a)(1)(A). The ordinary meaning of those terms prohibits relying on any other considerations. "Exclusive" means that the

fiduciaries must act for the "whole, undivided" purpose of securing those benefits for participants. *Exclusive*, Black's Law Dictionary (11th ed. 2019); *Exclusive*, American Heritage Dictionary of the English Language 458 (1969) ("Not divided or shared with others … Single or independent; sole[.]"). "Solely" likewise means "to the exclusion of all else." *Solely*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/solely; *Sole*, American Heritage Dictionary of the English Language 1229 ("Being the only one; existing or functioning without another or others; only."); *Solely*, Oxford Student's Dictionary of American English 570 (1st ed. 1983) ("alone; only").

The Supreme Court in *Dudenhoeffer* made clear that the term "benefits" as used in these provisions refers to "financial benefits" and "does not cover nonpecuniary benefits," such as "securing capital funds" for the employer or "bringing about stock ownership" for employees. 573 U.S. at 416, 420–21 (cleaned up). Moreover, the Court clarified, those financial benefits must be "the sort of *financial* benefits (such as retirement income)" that ERISA protects. *Id.* at 421. Thus, fiduciaries can act only to secure financial benefits for their clients and must exclude all other considerations from their decision-making.

The structure of ERISA confirms this reading. The statute includes specific but narrow exceptions to the duty of loyalty. *See* 29 U.S.C. § 1103(c)(1); *id.* § 1104(a). For example, fiduciaries are expressly permitted to return mistaken contributions made by an employer within a limited time, either six months or one year. *Id.* § 1103(c)(2)(A). Fiduciaries can similarly return funds conditioned on initial tax qualification of a retirement plan if the plan receives an adverse determination, but again only within a limited period. *Id.* § 1103(c)(2)(B); *see also id.* § 1103(c)(2)(C). The exclusive-benefit rule also does not apply when allocating assets upon termination of a retirement plan. *Id.* §§ 1103(d), 1104(a)(1); *see Bussian v. RJR Nabisco*, 223 F.3d 286, 295 (5th Cir. 2000).

"Despite the exclusive benefit rule," moreover, "ERISA § 408(c)(3) explicitly allows corporate insiders—who already have fiduciary duties under corporation law—to serve as ERISA fiduciaries." *Halperin v. Richards*, 7 F.4th 534, 547 (7th Cir. 2021); *see* 29 U.S.C. § 1108(c)(3). Such corporate insiders would otherwise have a disqualifying conflict of interest. *Amax Coal*, 453 U.S. at 332 (concluding the duty of loyalty prevented an employer-appointed trustee from acting as the employer's

agent for labor law purposes). ERISA even "invites conflicts of interest" in some circumstances by allowing investments in company stock under employee stock ownership plans. *Halperin*, 7 F.4th at 547; *see* 29 U.S.C. § 1107(b)(1), (d)(3)(A)(ii).

But Congress never said that fiduciaries can ignore the "sole" and "exclusive benefit" requirements and consider collateral factors when fiduciaries think that investment choices result in some form of a tie. When Congress wanted to deviate from a strict duty of loyalty, it knew how to do so, even for the most minute of potential violations like refunding mistaken contributions. 29 U.S.C. § 1103(c)(2)(A). The existence of some exceptions implies the lack of others, foreclosing a tiebreaker exception to the sole-and-exclusive-benefit rule. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018); Antonin Scalia & Bryan Garner, *Reading Law* 107 (2012); *see also Amax Coal*, 453 U.S. at 330 ("[W]e must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary.").

Indeed, it's far from clear that true "ties" exist in investing. The 2022 Rule concedes that "no two investments are the same in each and

every respect," 87 Fed. Reg. at 73,836, meaning there are always ways to distinguish between even best-in-class investments. Prudent fiduciaries might weigh those characteristics differently, but deciding how to proceed when various factors point in different directions is what money managers do. A loyal fiduciary would not be frozen by indecision without a tiebreaker that allows non-pecuniary preferences to slip in.

Moreover, when choosing between best-in-class investments, ERISA already supplies its own default answer. Fiduciaries have a duty to diversify investment options "to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C); *see also Schweitzer*, 960 F.3d at 194–95. In other words, choose both rather than just one. This directive logically applies with greatest force when those investment options are deemed comparable.[2]

It would be surprising if ERISA enacted a strong duty of loyalty— the "highest known to the law," *Schweitzer*, 960 F.3d at 194 (cleaned

---

[2] DOL raised the prospect that it might be imprudent to diversify in some situations where investment options are equal. In that situation, if it exists at all, the fiduciary could choose (even randomly, if needed) between the options. But ERISA makes clear that the answer *cannot* be determined by some collateral factor, especially to align with the fiduciary's preferences or what might create the most value for third parties or society as a whole.

up)—only to silently allow collateral considerations once investment options are subjectively deemed comparable. In other contexts where the law disallows certain considerations, neither Congress nor the Constitution lets them resurface—even as a "tip" factor—just because permissible factors failed to generate a clear-cut answer. *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 219 (2023); *id.* at 290, 294 (Gorsuch, J., concurring). "What cannot be done directly cannot be done indirectly." *Id.* at 230 (cleaned up).

ERISA's drafting history reinforces this conclusion. Congress considered several proposals to permit fiduciaries to engage in "social investing," but included no such provisions in ERISA. *See* James D. Hutchinson & Charles G. Cole, *Legal Standards Governing Investment of Pension Assets for Social and Political Goals*, 128 U. Pa. L. Rev. 1340, 1365–69 (1980) (collecting examples). Ralph Nader, for example, proposed a bill that would have allowed retirement funds to put up to ten percent of their assets in "social" investments. *Welfare and Pension Plan Legislation: Hearings on H.R. 2 and H.R. 462 Before the Gen. Subcomm. on Lab. of the H. Comm. on Educ. and Labor*, 93d Cong. 260 (1973) (statement of Ralph Nader, Karen Ferguson). Congress never adopted it.

"In light of these congressional responses to specific proposals for social investing," scholars have concluded that "it appears inappropriate to stretch the 'solely in the interest' language" to allow the same considerations as tiebreakers. Hutchinson & Cole, *supra*, at 1366–67.

The District Court therefore erred when it concluded that ERISA was silent as to whether it permitted the consideration of collateral considerations as a tiebreaker. ROA.2294. "Exclusive" means "exclusive."

> 2. *The common law of trusts confirms that ERISA forbids collateral considerations.*

As this Court has noted, ERISA's fiduciary duties are "derived from the common law of trusts and are the highest known to the law." *Schweitzer*, 960 F.3d at 194 (cleaned up); *see* 29 U.S.C. §§ 1103(a), (c)(1), 1104(a)(1); *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015); *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 & n.10 (1985); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411–12 (5th Cir. 2003). ERISA's statutory duty of loyalty even lifts its language from the common law. *Cf.* Restatement (Second) of Trusts § 170(1) (1959) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."). Courts "generally presume that such common-law terms bring the old soil with them." *Twitter, Inc. v.*

*Taamneh*, <u>598 U.S. 471, 484</u> (2023) (cleaned up); *see* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

The duty of loyalty is "the most fundamental" rule of trust law. 2A Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 170, at 311 (4th ed. 1987). It prohibits fiduciaries from being "influenced" in any way "by the interest of any third person or by motives other than the accomplishment of the purposes of the trust." Restatement (Third) of Trusts § 78 cmt. f (2007); *see* Restatement (Second) of Trusts § 170, cmt. q. This includes anything "advancing or expressing the trustee's personal views concerning social or political issues or causes." Restatement (Third) of Trusts § 90 cmt. c.

To enforce these duties, trust law imposes categorical, prophylactic rules to ensure that fiduciaries avoid entirely the siren call of collateral considerations. As this Court explained, "[i]t is generally, if not always, humanly impossible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. Consciously or unconsciously he will favor one side as against the other, where there is or may be a conflict of interest." *Fulton Nat'l Bank v. Tate*, <u>363 F.2d 562,</u>

[571](#) (5th Cir. 1966) (cleaned up). To avoid this risk, trust law prefers to "remove altogether the occasions of temptation rather than to monitor fiduciary behavior and attempt to uncover and punish abuses when a trustee has actually succumbed to temptation." Restatement (Third) of Trusts § 78 cmt. b.

Thus, when a fiduciary acts with mixed motives, even when those considerations "were harmless" to the beneficiary, courts impose "an irrebuttable presumption of wrongdoing." *Halperin*, [7 F.4th at 546](#) (cleaned up); *see also Donovan v. Bierwirth*, [680 F.2d 263, 271](#) (2d Cir. 1982) (explaining that ERISA requires decisions to "be made with an eye single to the interests of the participants and beneficiaries," which requires trustees to not put "themselves in a position" where they cannot function "with the complete loyalty to participants demanded of them"); *Blankenship v. Boyle*, [329 F. Supp. 1089, 1113](#) (D.D.C. 1971) (explaining that the duty of loyalty prohibits fiduciaries "from operating the Fund in a manner designed in whole or *in part* to afford collateral advantages" (emphasis added)).

Rather than avoid the siren call, the tiebreaker provision in the 2022 Rule amplifies it and expressly permits fiduciaries to act with mixed

motives, violating these longstanding trust-law principles incorporated by ERISA. The District Court failed to consider this common law background at all.

        3.     *The Supreme Court has already interpreted "sole and exclusive benefit" to bar collateral considerations.*

In *Amax Coal*, the Supreme Court considered a provision in the National Labor Relations Act ("NLRA") with language nearly identical to ERISA. The NLRA permitted employers and unions to establish employee-benefit trust funds if employers and employees were equally represented among the trustees. 453 U.S. at 325. It also required that those trustees act "'for the sole and exclusive benefit of the employees.'" *Id.* at 329 (quoting 29 U.S.C. § 186(c)(5)).

The case turned on how to interpret the "sole and exclusive benefit" rule. The Court noted that those terms had "accumulated settled meaning" through the common law of trusts, which included "an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties." *Id.* This rule existed to "deter the trustee from all temptation and to prevent any possible injury to the beneficiary," and so it "must be enforced with uncompromising rigidity." *Id.* at 329–30 (cleaned up).

"A fiduciary cannot contend," the Court explained, "'that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one.'" *Id.* at 330 (quoting *Woods v. City Nat'l Bank & Tr. Co. of Chi.*, 312 U.S. 262, 269 (1941)). And, especially relevant here, the Court acknowledged that ERISA "essentially codified" the same strict fiduciary standards in its own "exclusive benefit" rule. *Id.* at 332.

The obvious textual similarities and express comparison to ERISA confirm that ERISA's duty of loyalty should be read the same way. *See Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) ("The rule of in pari materia—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."). It makes no difference whether a fiduciary concludes—rightly or wrongly—that collateral considerations won't subordinate the interests of plan participants. The sole-and-exclusive-benefit rule is an "'uncompromising'" prophylactic to ensure that collateral considerations never even tempt fiduciaries at all. *Id.* at 329–30.

The District Court failed to consider *Amax Coal* at all.

### 4. The major-questions doctrine also forecloses the tiebreaker provision of the 2022 Rule.

In "extraordinary cases," "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 142 S. Ct. at 2608 (cleaned up). "This expectation of clarity is rooted in the basic premise that Congress normally 'intends to make major policy decisions itself, not leave those decisions to agencies.'" *Biden v. Nebraska*, 143 S. Ct. 2355, 2380 (2023) (Barrett, J., concurring) (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc)). The 2022 Rule bears the hallmarks of such an extraordinary case.

The 2022 Rule is economically significant. ERISA applies to the retirement plans of 158 million Americans and nearly $13 trillion in assets. Emp. Benefits Sec. Admin., DOL, *FY 2023 Congressional Budget Justification, Employee Benefits Security Administration* 10, https://www.dol.gov/sites/dolgov/files/general/budget/2023/CBJ-2023-V2-01.pdf. DOL estimates that 20 percent of all plans, comprising 28.5 million participants, will be affected by the changes in the 2022 Rules

"because their fiduciaries consider or will begin considering climate change or other ESG factors when selecting investments." 87 Fed. Reg. at 73,857–58 & nn.117–18.

By making it easier for fiduciaries to invest using ESG and other collateral considerations, the 2022 Rule will affect significant sums of money and "possibly foretells renewal of momentum in favor of ESG investing." David Cifrino, *The Politicization of ESG Investing*, Harvard Advanced Leadership Initiative: Soc. Impact Rev. (Jan 24, 2023), https://www.sir.advancedleadership.harvard.edu/articles/politicization-of-esg-investing. The pressure to direct funds using ESG criteria is immense. To illustrate the point, public pension plans—which are not subject to ERISA—"applied ESG to … more than half of all assets." Jean-Pierre Aubry et al., *ESG Investing and Public Pensions: An Update*, Ctr. for Ret. Rsch. at Bos. Coll., State & Local Pension Plans No. 74, at 3 (Oct. 2020), https://crr.bc.edu/wp-content/uploads/2020/10/SLP74.pdf. Some of those ESG investments are now the subject of litigation, alleging significant losses. *See e.g.*, *Wong v. N.Y.C Emps. Ret. Sys.*, No. 652297/2023 (N.Y. Supreme Ct. filed May 11, 2023).

The 2022 Rule carries just as much political significance. ESG investing is one of the most controversial contemporary political issues. *How ESG Became Part of America's Culture Wars*, The Economist (June 21, 2023), https://www.economist.com/the-economist-explains/2023/06/21/how-esg-became-part-of-americas-culture-wars. Congress itself has engaged in "earnest and profound debate" on this very issue, failing to adopt numerous bills on the subject—both when it originally considered ERISA and now—making DOL's attempt to resolve it unilaterally "all the more suspect." *West Virginia*, 142 S. Ct. at 2614 (cleaned up); *see, e.g.*, The Freedom to Invest in a Sustainable Future Act, S. 523, 118th Cong. (2023); Retirees Sustainable Investment Opportunities Act of 2021, H.R. 3604, 117th Cong.; Financial Factors in Selecting Retirement Plan Investments Act, H.R. 3387, 117th Cong. (2021); Retirees Sustainable Investment Policies Act of 2020, H.R. 8959, 116th Cong.; Hutchinson & Cole, *supra*, at 1365–69 (collecting examples).

Underscoring the point, Congress passed a bipartisan resolution of disapproval to invalidate the 2022 Rule under the Congressional Review Act. H.R.J. Res. 30, 118th Cong. The 2022 Rule survived only because President Biden vetoed the resolution in March 2023, the first veto of his

presidency. Congress's express action here is alone sufficient to implicate the major-questions doctrine, signaling a politically charged question that belongs in Congress, not an executive agency.

Finally, the 2022 Rule brings about a "radical or fundamental change" to ERISA. *West Virginia*, 142 S. Ct. at 2609 (cleaned up). As discussed above, the consideration of collateral factors is antithetical to the fiduciary duties that Congress made central to ERISA. Shifting the regulatory scheme to permit such behavior is the kind of change that requires more than "modest words," "vague terms," or "subtle devices." *Id.* (cleaned up). But DOL can show no clear statement of authorization for the tiebreaker provision in the 2022 Rule. Instead, ERISA explicitly *prohibits* the collateral considerations the 2022 Rule permits, requiring fiduciaries to act "solely" and "for the exclusive purpose of" providing "benefits to participants and their beneficiaries." 29 U.S.C. §§ 1103(c)(1), 1104(a)(1)(A).

The District Court reasoned that because previous DOL guidance permitted collateral considerations as a tiebreaker, the "history and breadth of the authority that the agency has asserted" did not implicate the major-questions doctrine. ROA.2295 n.3. That skips important

context. The District Court ignored that DOL itself has questioned (and recently) whether its tiebreaker provision is consistent with ERISA. *See* 85 Fed. Reg. at 39,123. The "settled practice" is that DOL has never figured out what to do with tiebreakers—it is and always has been controversial and in flux. *See* Part A.2, *supra*; Part I.B, *infra*. DOL's prior statements in favor of tiebreakers (all in guidance, save for an equivocal discussion in the 2020 Rules) are thus insufficient, especially since they simply cannot be squared with the text and structure of ERISA, the common law of trusts, and the Supreme Court's interpretation of near-identical text.

The major-questions doctrine, moreover, can still apply even when "some context clues from past major questions cases are absent." *Nebraska*, 143 S. Ct. at 2384 (Barrett, J., concurring). "[T]he doctrine is not an on-off switch that flips when a critical mass of factors is present." *Id.* Instead, "as more indicators ... are present, the less likely it is that Congress would have delegated the power to the agency without saying so more clearly." *Id.* Multiple economic, political, and historical factors confirm here that the question of whether ERISA permits collateral considerations belongs to Congress, not DOL.

Indeed, the major-questions doctrine has its roots in a Supreme Court decision where past agency practice supported the challenged action. In *MCI Telecommunications Corp. v. AT&T*, the Court required clear statutory authority for a Federal Communications Commission rule about the duty of nondominant carriers to file tariffs, because it effected a "fundamental revision of the statute." 512 U.S. 218, 231 (1994). The Court required a clear statement notwithstanding that the agency had issued similar orders in the past. *Id.* at 221–23. The Court has continued to recognize *MCI* as a foundational example of the major-questions doctrine, yet it did not involve an unprecedented exercise of agency authority. *See West Virginia*, 142 S. Ct. at 2609; *NFIB v. DOL*, 595 U.S. 109, 123 (2022) (Gorsuch, J., concurring). Perhaps this explains why Justice Gorsuch declined to include an unprecedented-act requirement in his "list of triggers" for the doctrine. *West Virginia*, 142 S. Ct. at 2620–22 (Gorsuch, J., concurring).

The 2022 Rule's tiebreaker provision requires clear authorization from Congress because it creates consequences of vast economic and political significance, and it transforms the core fiduciary duties of ERISA. DOL has identified no such authority.

**B.   Past Practice Doesn't Justify Collateral Tiebreakers.**

DOL has repeatedly argued that the 2022 Rule is valid because the agency has previously issued guidance authorizing tiebreakers. But past practice cannot justify the agency action here. *Cf.* Anita S. Krishnakumar, *Longstanding Agency Interpretations*, 83 Fordham L. Rev. 1823, 1836–42 (2015) (collecting examples where longstanding agency practice was rejected by the Supreme Court).

DOL's past authorization of tiebreakers displays all the features of an agency practice that should receive no weight from a reviewing court. *First*, past agency practice can never override the plain meaning of a statute. As discussed above, ERISA states that fiduciaries must focus "solely" and "exclusive[ly]" on furthering the financial interests of plan participants, ruling out any collateral considerations. *See* Part I.A.1, *supra*. This incorporates common-law trust principles and parallel language has been interpreted by the Supreme Court in a related statute. *See* Part I.A.2–3. Even a "contemporaneous and longstanding" DOL interpretation must fall when "at odds with the plain language of the statute itself." *Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989).

*Second*, past practice deserves less weight when the agency never engaged in thorough statutory interpretation. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining the weight of an agency interpretation "will depend upon the thoroughness evident in its consideration"). DOL has never engaged in thorough statutory analysis to show why a tiebreaker provision is consistent with ERISA, and it specifically sought comment on that question when it proposed the 2020 Rules.

In the 1994 guidance, for example, DOL put forward its view that fiduciaries can consider collateral benefits when doing so would not subordinate the interests of participants. 59 Fed. Reg. at 32,606–07. DOL never explained how that would be consistent with the text and structure of ERISA, the underlying trust law, or *Amax Coal*. All it offered in defense of its interpretation was that it was consistent with "certain broad principles" that DOL itself had previously articulated in exemption and advisory opinion letters. *Id.* at 32,606.[3]

-----

[3] The 2008 guidance did not provide much more analysis. There, DOL relied on the fact that "past guidance" had blessed considering collateral factors as a tiebreaker. 73 Fed. Reg. at 61,735. And it defended this interpretation of ERISA on the ground that "ERISA does not itself specifically provide a basis" for resolving a tie

(*footnote continued on next page*)

When DOL parsed the statute in more depth in 2020, it came away questioning whether a tiebreaker is ever permissible under ERISA. In the proposal leading up to the 2020 Rule, DOL asked whether a tiebreaker "should be abandoned as inconsistent with the fiduciary duties of ERISA." 85 Fed. Reg. at 39,123. And while DOL retained a modified tiebreaker in the end, it did so only after suggesting that ties might not exist and noting that "enhanced scrutiny" was necessary for the tiebreaker given "trust fiduciary law." 85 Fed. Reg. at 72,860–61. This is not the kind of agency statement that should persuade a court to deviate from the plain text of the statute and defer to agency practice. The history of the tiebreaker provision shows path dependency, not a consistent agency position.

*Third*, past practice deserves less weight when it emerges years after enactment. *See Ctr. for Auto Safety v. Ruckelshaus*, 747 F.2d 1, 5 (D.C. Cir. 1984); *cf. Chemehuevi Tribe v. Fed. Power Comm'n*, 420 U.S. 395, 409–10 (1975). DOL has admitted that the "first comprehensive

---

and that the plan is fully protected once a fiduciary is choosing between "economically indistinguishable" investments. *Id.* It contained no discussion of the structure of ERISA, the common law of trusts, or the duty to diversify.

guidance" addressing what became a tiebreaker provision came in 1994, two decades after Congress passed ERISA. 85 Fed. Reg. at 72,846.

*Fourth*, past practice deserves less weight when it appears in sub-regulatory guidance rather than notice-and-comment rulemaking. Guidance documents lack the procedural regularity that "tend[s] to foster the fairness and deliberation that should underlie a pronouncement" that carries binding force. *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). But until the 2020 Rules, the agency practice that DOL relies on was all sub-regulatory guidance.

*Fifth*, past practice deserves less weight when Congress has never acted to ratify the agency's interpretation. *Cf. Sackett v. EPA*, 598 U.S. 651, 682–83 (2023). Far from it, Congress voted to invalidate the 2022 Rule under the Congressional Review Act. *See* H.R.J. Res. 30, 118th Cong. Allowing past DOL guidance on tiebreakers to control here would encourage agencies to engage in adverse possession of statutory authority. Repeated, unreasoned statements of statutory authority in informal guidance cannot be enough to change what ERISA requires.

## C.     The District Court Erred in Relying on *Chevron.*

The District Court improperly invoked *Chevron* and deferred to DOL's interpretation of ERISA. Under that familiar framework, courts defer to reasonable agency interpretations of law. Courts must first use all available tools of statutory construction before determining there's a gap for the agency to fill. 467 U.S. at 842–43 & n.9 (1984).

*Chevron* deference is inappropriate here for several reasons. *First*, ERISA's duty of loyalty is clear. As detailed above, a requirement to act "solely" and "exclusive[ly]" for the financial benefit of participants leaves no room for considering collateral benefits, even as a tiebreaker. *See* Part I.A, *supra.*

*Second*, *Chevron*'s primary application involves "statutes using broad and open-ended terms like 'reasonable,' 'appropriate,' 'feasible,' or 'practicable.'" Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2153 (2016). In those situations, courts reason that someone must fill the "gap" of what such terms mean, and *Chevron* says that it should usually be the agency. ERISA, by contrast, does not use those vague terms. It compels fiduciaries to act "solely" and "for the

exclusive purpose of" providing "benefits to participants and their beneficiaries." 29 U.S.C. §§ 1103(a), (c)(1), 1104(a)(1).

Deciding whether the 2022 Rule's tiebreaker provision complies with that statute thus involves the judicial craft of statutory interpretation. This Court should therefore "determine whether the agency's interpretation is the best reading of the statutory text," even when the question is a close one. Kavanaugh, *supra*, at 2154. *Chevron* simply does not apply here.

Even if ERISA were silent about whether fiduciaries can consider collateral factors as a tiebreaker, that silence would be exceedingly narrow. It would apply only when investments could not be distinguished based on the financial considerations ERISA mandates, and even then only if it would be imprudent to invest in both under the duty to diversify. But the 2022 Rule goes much further and therefore exceeds even the broadest possible view of DOL's interpretive authority under *Chevron*.

The District Court further erred in justifying the tiebreaker provision as a reasonable interpretation of ERISA by concluding that "there is little meaningful daylight between 'equally serve' and 'unable to distinguish,'" comparing the regulatory language of the 2022 Rule and

2020 Rules. ROA.2295. DOL has similarly tried to dismiss past changes to the tiebreaker provision as "mostly semantic variation," arguing that the standard in the 2022 Rule approximates the standard in the 2020 Rules. 87 Fed. Reg. at 73,836. That is wrong.

The District Court was wrong to compare the 2022 Rule to the 2020 Rules, not ERISA. After all, *Chevron* asks if the agency adopted a reasonable interpretation of the underlying statute. 467 U.S. at 842–43. The phrase "equally serve the financial interests of the plan" also means something different than "unable to distinguish on the basis of pecuniary factors alone" on its face. One focuses on true inability to distinguish, while the other provides intentional flexibility to subjectively equate non-identical opportunities and potentially depart from best-in-class investments.

DOL certainly believed the two standards were different. DOL undertook extensive notice-and-comment rulemaking, a step completely unnecessary if the agency did not intend to change the substance of the tiebreaker provision. In that rulemaking, DOL itself claimed that commenters had complained that the old tiebreaker standard was too stringent, so DOL made it easier for fiduciaries to claim ties and fall back

on collateral considerations like ESG, and even removed a disclosure requirement that ensured oversight of such claims. 87 Fed. Reg. at 73,835–37. DOL explicitly stated the 2022 Rule "version of the tiebreaker is more flexible" and "intended to be broader" than the 2020 Rules. *Id.* at 73,860, 73,876.

Further, DOL has previously recognized that its tiebreaker provisions are *not* equivalent. The 2008 guidance and the 2020 Rules were premised on the explicit recognition that the standards differed and that more stringent requirements were necessary to protect plan participants from fiduciary breaches, whether intentional or inadvertent. 73 Fed. Reg. at 61,736; 85 Fed. Reg. at 72,861–62.

In any event, *Chevron* deference violates the constitutional separation of powers and the APA. *See, e.g.*, *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151–58 (10th Cir. 2016) (Gorsuch, J., concurring). The Supreme Court is considering those arguments in *Loper Bright Enterprises v. Raimondo* (No. 22-451), and *Relentless, Inc. v. Department of Commerce* (No. 22-1219). If this Court concludes *Chevron* deference would be warranted, this Court should wait for the Supreme Court to decide those cases before issuing its decision.

*   *   *

Accordingly, the 2022 Rule's tiebreaker provision violates ERISA.

## II.   THE 2022 RULE IS ARBITRARY AND CAPRICIOUS.

Under the APA, courts must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action must be both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Agencies fail this test when the explanation for agency action contains "unexplained inconsistencies," "relied on factors which Congress has not intended it to consider," or failed to "consider an important aspect of the problem." *Sierra Club v. EPA*, 939 F.3d 649, 663–64 (5th Cir. 2019) (cleaned up).

When changing directions, agencies must also "provide a more detailed justification than what would suffice for a new policy created on a blank slate … when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015). Indeed, "changes

50

require careful comparison of the agency's statements at *T0* and *T1* to ensure that the agency has recognized the change, reasoned through it without factual or legal error, and balanced all relevant interests affected by the change." *Louisiana*, 2024 WL 80398, at *4.

Arbitrary-and-capricious review is not "'toothless,'" but "has 'serious bite.'" *Id.* at *5 (quoting *Data Mktg. P'ship*, 45 F.4th at 856).

The 2022 Rule fails each of these standards.

## A.    The 2022 Rule Is Internally Inconsistent and Unreasonable.

The 2022 Rule is internally inconsistent. It asserts the need for a tiebreaker provision, but immediately admits that "no two investments are the same in each and every respect" because even investments that would otherwise fall under the tiebreaker provision "can and do differ in a wide range of attributes." 87 Fed. Reg. at 73,836. If prudent fiduciaries can always distinguish between two investments, there is no need ever to have a tiebreaker, let alone one that invokes collateral considerations. A rulemaking this "internally inconsistent" is arbitrary and capricious. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).

The 2022 Rule also removed all reference to the words "pecuniary" and "nonpecuniary" from the regulations. 87 Fed. Reg. at 73,834. DOL

explained that "the central premise behind the [2022 Rule]'s rescission of the pecuniary/non-pecuniary distinction is that the current regulation is being perceived by plan fiduciaries and others as undermining the fundamental principle *Dudenhoeffer* expressed." *Id*. The *Dudenhoeffer* principle is that sections 403 and 404 of ERISA require fiduciaries to act only for the financial benefit of beneficiaries, which "does not cover nonpecuniary benefits." 573 U.S. at 421. It was flatly illogical for DOL to conclude that the best way to convey the meaning of sections 403 and 404, as interpreted by *Dudenhoeffer*, was to omit the exact language *Dudenhoeffer* used. The problem wasn't that the language was unclear, it's that it was too clear.

Because an earlier opinion of the Supreme Court "has already interpreted the statute," "there is no longer any different construction that is … available for adoption by the agency." *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 487 (2012) (plurality); *id*. at 492–93 (Scalia, J., concurring) ("'Once a court has decided upon its *de novo* construction of the statute, there no longer is a different construction that is consistent with the court's holding and available for adoption by the agency.'" (quoting *Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet*

*Servs.*, [545 U.S. 967, 1017](#) n.12 (2005) (Scalia, J., dissenting))). Attempting otherwise was per se unreasonable.

## B.     The 2022 Rule Considered Improper Factors.

DOL "relied on factors which Congress has not intended it to consider" when it decided to give fiduciaries increased freedom to pursue collateral considerations. *State Farm Mut. Auto. Ins.*, [463 U.S. at 43](#). The 2022 Rule focused on how to make use of tiebreakers easier, how to minimize litigation risk for fiduciaries who use the tiebreaker, and how to help fiduciaries avoid scrutiny for their use of tiebreakers. None of those factors is an appropriate consideration under ERISA.

DOL changed the standard from "unable to distinguish on the basis of pecuniary factors alone" to "equally serve the financial interests of the plan." [87 Fed. Reg. at 73,836](#). DOL did so because it claimed the prior standard was "impractical and unworkable," *id.*, citing comments that asserted the standard set an "unrealistically difficult and prohibitively stringent standard" that was "rare and unreasonably difficult to identify," *id.* at 73,835. But nothing in ERISA directs DOL to facilitate the use of tiebreakers or prioritize anything other than maximizing the financial interests of plan participants. If it's hard to identify true ties,

that's because they're rare—if they exist at all. And as explained above, ERISA already provides that in such scenarios, the fiduciary should invest in both, not invoke an agency-invented "tiebreaker" process.

The 2022 Rule also removed the requirement for fiduciaries to document both why pecuniary factors alone were not sufficient to make the investment selection, and why the non-pecuniary factor was consistent with the plan's interests. *Id.* at 73,837–38. That requirement was intended to protect plan participants and facilitate oversight whenever fiduciaries consider collateral factors. 85 Fed. Reg. at 72,851.

DOL justified removing the documentation requirement because it "uniquely directs potential litigants' attention to tie-breaker decisions as inherently problematic," and creates "the potential for litigation" that might alter fiduciary decision-making. 87 Fed. Reg. at 73,838. But alerting participants to the fact that their fiduciaries are pursuing collateral goals—a long-recognized red flag for fiduciary duties, *see* Part I.A.2, *supra*— and documenting those decisions is exactly the kind of requirement that ERISA was designed to provide, *see, e.g.*, 29 U.S.C. § 1001(a) (stating ERISA's purpose "that disclosure be made and safeguards be provided" to prevent fiduciary breaches); *see also*

*McDonald v. Provident Indem. Life Ins. Co.,* 60 F.3d 234, 237 (5th Cir. 1995) ("Section 404(a) imposes on a fiduciary the duty of undivided loyalty to plan participants and beneficiaries, as well as a duty to exercise care, skill, prudence and diligence. An obvious component of those responsibilities is the duty to disclose material information.").

Nothing in ERISA says that reducing litigation risks when fiduciaries consider admittedly non-pecuniary factors is a proper justification for DOL rulemaking. That turns ERISA on its head, from a statute protecting plan participants to one that protects fiduciaries, who are duty-bound to exclusively pursue the financial interests of those participants.

DOL could not have been clearer that these improper considerations pervaded its decision-making when it also abandoned a proposal from the NPRM that would have required fiduciaries simply to disclose when they had considered collateral factors in selecting options for participant-driven plans. 87 Fed. Reg. at 73,839–41. DOL justified omitting the provision in part because the disclosures had "no economic significance," and commenters feared they would "draw ... attention to the non-financial motives of the plan fiduciary" and have a "chilling effect

on the proper use of climate change and other ESG factors." *Id.* at 73,839–40. DOL also worried that some fiduciaries might avoid collateral considerations altogether to "avoid the litigation risk." *Id.* at 73,840. But again, the point of ERISA is to protect plan participants from fiduciary breaches, inadvertent or intentional, not protect fiduciaries from litigation when they invoke collateral considerations that by definition do not affect the financial interests of the plan participants. DOL didn't just give fiduciaries additional flexibility to consider ESG, it allows them to do it in secret.

Contrary to ERISA's text, structure, and purpose, the 2022 Rule expands the use of collateral considerations while ensuring that fiduciaries face less scrutiny and liability for doing so.

## C. The 2022 Rule Failed to Consider Important Aspects of the Problem or Justify the Agency's Departure from Past Factual Findings.

The 2022 Rule creates a significant problem for plan sponsors and participants. By making it easier for fiduciaries to consider collateral factors and then avoid related disclosures, sponsors and participants must now spend increased time and resources monitoring the decisions made by their fiduciaries.

At no point in the rulemaking did DOL reckon with the obvious reality that *every* aspect of the 2022 Rule increases the flexibility of fiduciaries to consider collateral factors and impedes oversight, requiring sponsors and participants to spend additional resources to monitor fiduciaries. From expanding the tiebreaker provision, to removing documentation requirements, to lifting restrictions on QDIAs and exercising proxy rights, DOL failed to consider this increased burden, a danger well "within the ambit of the existing policy" and ERISA. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up). That failure alone justifies finding the 2022 Rule arbitrary and capricious. *See Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023) ("A regulation is arbitrary and capricious if the agency failed to consider … the costs and benefits associated with the regulation." (cleaned up)). DOL completely ignored costs to sponsors and participants.

To be sure, DOL did note that commenters "expressed concern" the 2022 Rule would "open the door to using pension plan assets for policy agendas." 87 Fed. Reg. at 73,835. All DOL offered in response was its boilerplate, general assurances that general fiduciary duties still applied,

and there was no need to worry because the tiebreaker provision applies only in narrow circumstances. *See id.* at 73,836. That does nothing to respond to concerns about increased monitoring costs to protect against fiduciary breaches, and it's otherwise insufficient for an agency to "acknowledge[] the concern and move[] on." *Louisiana*, 2024 WL 80398, at *7.

In addition, DOL previously found that, notwithstanding the general fiduciary duties of prudence and loyalty, there were "shortcomings in the rigor of the prudence and loyalty analysis by some participating in the ESG investment marketplace." 85 Fed. Reg. at 72,847, 72,850; *see* 85 Fed. Reg. at 81,678 (similar). That finding was the basis of the 2020 Rules and another danger well "within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (cleaned up).

Crucially, DOL failed to acknowledge and confront this past agency finding. It did not repudiate or even discuss it. Instead, DOL simply stated that it "emphatically addresses potential loyalty breaches by forbidding subordination of participants' financial benefits under the plan to ESG or any other goal." 87 Fed. Reg. at 73,853. This general recitation of fiduciary duty was the backdrop against which the 2020

Rules were issued, and DOL itself previously found it inadequate to protect participants, especially in the context of ESG. 85 Fed. Reg. at 72,847, 72,850; 85 Fed. Reg. at 81,678.

Failure to confront this past finding and provide "a more detailed justification" for departing from it renders the rulemaking arbitrary and capricious. *Fox*, 556 U.S. at 515; *see also Louisiana*, 2024 WL 80398, at *7. Indeed, this failure to consider the need to protect plan participants and beneficiaries is a common thread throughout the 2022 rulemaking.

## III. APPELLANTS HAVE STANDING.

Only one party needs standing for the case to proceed. *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006). DOL did not challenge the standing of the private parties in this case, and the District Court correctly held that they have standing. ROA.2293 n.1.

When a party is "'an object of the action'" at issue, "'there is ordinarily little question that the action or inaction has caused him injury, and that a [favorable] judgment … will redress it.'" *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019). This "'is a flexible inquiry rooted in common sense,'" *id.*, and considers the "'practical impact'" of the

regulation, *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015).

Liberty Oilfield Services LLC and Western Energy Alliance are employers that provide 401(k) retirement plans for their employees. Alex Fairly is the owner of several businesses that also are employers that provide 401(k) plans to their employees. And James Copland is an employee who participates in a 401(k) retirement plan. Each of these parties wants to see their retirement plans managed to maximize financial returns and will incur additional expenses in time and resources as a result of the 2022 Rule reviewing the recommendations of plan advisors to ensure that the investment choices are not affected by collateral considerations. *See* ROA.500–02, Stock Decl. ¶¶ 10–15; ROA.505–06, Poppel Decl. ¶¶ 3–8; ROA.727–28, Fairly Decl. ¶¶ 17–24; ROA.518–19, Copland Decl. ¶¶ 14–18. Increased compliance and monitoring costs are well-recognized as sufficient to establish standing, *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021), as is the loss of legal protections, *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010).

Liberty Energy Inc. ("Liberty") is the parent company of Liberty Oilfield Services LLC and will be further harmed by decreased access to

investment capital. With increased ability to consider ESG factors under ERISA, fiduciaries can and likely will steer investment away from oil and gas companies like Liberty to ESG-aligned funds. ROA.503–04, Stock Decl. ¶¶ 22–26; ROA.550–52, 554, Dismukes Decl. ¶¶ 16–20, 24–25; *see* Part I.A.4, *supra*. This will raise Liberty's funding costs, which are determined in significant part by performance in the public equity market. ROA.503, Stock Decl. ¶ 21. Plan fiduciaries also have increased latitude to engage Liberty on collateral ESG considerations and vote plan assets in support of such proposals (or otherwise make investments that will have the same result), inviting explicitly nonpecuniary activists to wage costly campaigns against Liberty and divert its focus from maximizing shareholder value. ROA.501–03, Stock Decl. ¶ 15–20.

This potential loss of funding—even if indirect—establishes standing, *see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019), as do competitive-disadvantage injuries, *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021).

The States also set forth undisputed facts in the District Court that show standing in their proprietary capacity and because their citizens, industries, and commerce will be injured. The States will suffer

diminished tax revenues as a result of reduced retirement distributions and diminished economic growth because of harms to the oil and gas industries within their borders. ROA.554–58, Dismukes Decl. ¶¶ 24–42; ROA.523–26, Bhagat Decl. ¶¶ 8–14.

While DOL contested the States' standing, the District Court did not decide the issue because the private parties obviously have standing, and one party with standing is sufficient for courts to address the merits of a rulemaking under the APA. ROA.2293 n.1; *Rumsfeld*, 547 U.S. at 52 n.2. This Court need not reach the States' standing for the same reasons.

## CONCLUSION

This Court should reverse the District Court and remand with instructions to vacate the 2022 Rule.

Dated: January 25, 2024

Respectfully submitted,

/s/ Melissa A. Holyoak
SEAN REYES
Attorney General
MELISSA A. HOLYOAK
Solicitor General
CHRISTOPHER A. BATES
Deputy Solicitor General

Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov
chrisbates@agutah.gov

BRUNN (BEAU) ROYSDEN
Fusion Law, PLLC
7600 N. 15th Street, Suite 150
Phoenix, AZ 85020
(602) 315-7545
beau@fusion.law

*Counsel for State of Utah*

/s/ Jonathan Berry
JONATHAN BERRY
  *Counsel of Record*
R. TRENT MCCOTTER
MICHAEL BUSCHBACHER
JARED M. KELSON
ANDREW W. SMITH
CALEB ORR

Boyden Gray PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

*Counsel for Liberty Energy Inc.,
Liberty Oilfield Services LLC,* and
*Western Energy Alliance*

/s/ Neville Hedley
NEVILLE HEDLEY
ANNA ST. JOHN
Hamilton Lincoln Law Institute
1629 K Street NW, Suite 300
Washington, DC 20006
(917) 327-2392
ned.hedley@hlli.org
anna.stjohn@hlli.org

*Counsel for James R. Copland and
Alex L. Fairly*

/s/ Monroe David Bryant
KEN PAXTON
Attorney General
BRENT WEBSTER
First Assistant Attorney General
GRANT DORFMAN
Deputy First Assistant Attorney
    General
RALPH MOLINA
Deputy Attorney General for Legal
    Strategy
MONROE DAVID BRYANT
ZACHARY BERG
Special Counsels

Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2547
(512) 936-1700
brent.webster@oag.texas.gov
grant.dorfman@oag.texas.gov
ralph.molina@oag.texas.gov
david.bryant@oag.texas.gov
zachary.berg@oag.texas.gov

*Counsel for State of Texas*

/s/ Andrew Ferguson
JASON MIYARES
Attorney General
ANDREW N. FERGUSON
Solicitor General
KEVIN M. GALLAGHER
Deputy Solicitor General

Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
aferguson@oag.state.va.us
kgallagher@oag.state.va.us

*Counsel for Commonwealth of
Virginia*

/s/ Morgan Brungard
LIZ MURRILL
Attorney General
JOSEPH S. ST. JOHN
MORGAN BRUNGARD
Deputy Solicitor General
TRACY SHORT
Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
shortt@ag.louisiana.gov
brungardm@ag.louisiana.gov

*Counsel for State of Louisiana*

/s/ Edmund LaCour
STEVE MARSHALL
Attorney General
EDMUND LACOUR
Solicitor General

Alabama Attorney General's Office
501 Washington Ave
Montgomery, AL 36014
(334) 353-2196
edmund.lacour@alabamaag.gov

*Counsel for State of Alabama*

/s/ Benjamin Hofmeister
TREG TAYLOR
Attorney General
JEFFREY G. PICKET
Senior Assistant Attorney General
BENJAMIN HOFMEISTER
Assistant Attorney General

Alaska Department of Law
123 4th Street
Juneau, AK 99801
(907) 269-5275
jeff.pickett@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for State of Alaska*

/s/ Dylan Jacobs
TIM GRIFFIN
Attorney General
NICHOLAS J. BRONNI
Solicitor General
DYLAN JACOBS
Deputy Solicitor General

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*

/s/ Henry C. Whitaker
ASHLEY MOODY
Attorney General
HENRY C. WHITAKER
Solicitor General

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, FL 32399-1050
(850) 414-3300
henry.whitaker@myfloridalegal.com

*Counsel for State of Florida*

/s/ Stephen J. Petrany
CHRISTOPHER M. CARR
Attorney General
STEPHEN J. PETRANY
Solicitor General
Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

/s/ Josh Turner
RAÚL R. LABRADOR
Attorney General
JOSH TURNER
Acting Solicitor General

Idaho Attorney General's Office
700 W. Jefferson Street, Suite 210
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2400
josh.turner@ag.idaho.gov

*Counsel for State of Idaho*

/s/ Eric H. Wessan
BRENNA BIRD
Attorney General
ERIC H. WESSAN
Solicitor General

Iowa Attorney General's Office
1305 E. Walnut Street
Des Moines, IA 50319
(515) 281-5164
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

/s/ James A. Barta
THEODORE E. ROKITA
Attorney General
JAMES A. BARTA
Solicitor General

Indiana Attorney General's Office
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-6255
james.barta@atg.in.gov

*Counsel for State of Indiana*

/s/ Anthony J. Powell
KRIS W. KOBACH
Attorney General
ANTHONY J. POWELL
Solicitor General
JESSE A. BURRIS
Assistant Attorney General

Kansas Attorney General's Office
120 SW 10th Ave, 2nd Floor
Topeka, KS 66612
(785) 296-2215
anthony.powell@ag.ks.gov
jesse.burris@ag.ks.gov

*Counsel for State of Kansas*

/s/ Matthew F. Kuhn
RUSSELL COLEMAN
Attorney General
MATTHEW F. KUHN
Solicitor General
LINDSEY KEISER
Assistant Attorney General

Kentucky Attorney General's
  Office
700 Capital Avenue, Suite 118
Frankfort, KY
(502) 696-5478
matt.kuhn@ky.gov
lindsey.keiser@ky.gov

*Counsel for Commonwealth of
  Kentucky*

/s/ Justin L. Matheny
LYNN FITCH
Attorney General
JUSTIN L. MATHENY
Deputy Solicitor General

Mississippi Attorney General's
Office P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

/s/ Joshua M. Divine
ANDREW BAILEY
Attorney General
JOSHUA M. DIVINE
Solicitor General
MARIA A. LANAHAN
Deputy Solicitor General

Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
(573) 751-3321
josh.divine@ago.mo.gov
maria.lanahan@ago.mo.gov

*Counsel for State of Missouri*

/s/ Christian B. Corrigan
AUSTIN KNUDSEN
Attorney General
CHRISTIAN B. CORRIGAN
Solicitor General

Montana Department of Justice
215 N. Sanders St
Helena, MT 59601
(406) 444-2707
christian.corrigan@mt.gov

*Counsel for State of Montana*

/s/ Eric J. Hamilton
MICHAEL T. HILGERS
Attorney General
ERIC J. HAMILTON
Solicitor General

Nebraska Attorney General's
  Office
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
eric.hamilton@nebraska.gov

*Counsel for State of Nebraska*

/s/ Mark W. Dell'Orfano
JOHN M. FORMELLA
Attorney General
MARK W. DELL'ORFANO
Assistant Attorney General

New Hampshire Department of
  Justice
1 Granite Place
Concord, NH 03301
(603) 271-3650
mark.w.dellorfano@doj.nh.gov

*Counsel for State of New
Hampshire*

/s/ Phillip Axt
DREW H. WRIGLEY
Attorney General
PHILIP AXT
Solicitor General

North Dakota Attorney General's
  Office
600 E Boulevard Ave, Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.govctitus@nd.gov

*Counsel for State of North Dakota*

/s/ T. Elliot Gaiser
DAVE YOST
Attorney General
T. ELLIOT GAISER
Solicitor General
MATHURA J. SRIDHARAN
Deputy Solicitor General

Ohio Attorney General's Office
30 E. Broad St, 17th Fl.
Columbus, OH 43215
(614) 728-7511
thomas.gaiser@OhioAGO.gov
mathura.sridharan@OhioAGO.gov

*Counsel for State of Ohio*

/s/ Garry M. Gaskins, II
GENTNER F. DRUMMOND
Attorney General
GARRY M. GASKINS, II
Solicitor General
ZACH WEST
Director of Special Litigation

Oklahoma Attorney General's Office
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov
zach.west@oag.ok.gov

*Counsel for State of Oklahoma*

/s/ Thomas T. Hydrick
ALAN WILSON
Attorney General
THOMAS T. HYDRICK
Assistant Deputy Solicitor General

South Carolina Attorney General's Office
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

/s/ Gabriel Krimm
JONATHAN SKRMETTI
Attorney General and Reporter
GABRIEL KRIMM
Assistant Solicitor General

Office of the Attorney General and Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
(615) 532-5596
gabriel.krimm@ag.tn.gov

*Counsel for State of Tennessee*

/s/ Lindsay S. See
PATRICK MORRISEY
Attorney General
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Principal Deputy Solicitor General

West Virginia Attorney General's
  Office
State Capitol Complex, Bldg. 1,
  Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
(681) 313-4550
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

/s/ Ryan Schelhaas
BRIDGET HILL
Attorney General
RYAN SCHELHAAS
Chief Deputy Attorney General

Office of the Wyoming Attorney
  General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

F. SCOTT FLOW
Flow Law Firm, PLLC
800 SW 9th Avenue
Amarillo, Texas 79101-3206
(806) 372-2010
fsflow@flowlaw.com

*Co-Counsel for Appellants Except*
*States of Texas, Tennessee*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2024, I electronically filed the foregoing document with the Clerk of this Court by using the CM/ECF system, which will serve all parties automatically.

Dated: January 25, 2024

/s/ Jonathan Berry
Jonathan Berry
BOYDEN GRAY PLLC
801 17th St NW, Suite 350
Washington, DC 20006
(202) 955-0620

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fifth Circuit Rule 32 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,655 words, excluding the portions exempted by Rule 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure Rule 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook and 14-point font.


Dated: January 25, 2024          /s/ Jonathan Berry
                                 Jonathan Berry
                                 BOYDEN GRAY PLLC
                                 801 17th St NW, Suite 350
                                 Washington, DC 20006
                                 (202) 955-0620